STEPHEN C. RYAN, ID # 4255
**STEPHEN C. RYAN, P.C.**
9304 E. Raintree, #100
Scottsdale, Arizona  85260
(480) 661-3977
steveryan@azis.com
*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Timothy Youso and Michelle Youso, husband and wife, ) ) ) | No. 3:11-cv-08057-NVW |
| Plaintiffs, ) ) | PLAINTIFFS' MOTION FOR NEW TRIAL |
| vs. ) ) | |
| Pharmacists Mutual Insurance, a foreign corporation, ) ) ) | |
| Defendant. ) ) | |

     Pursuant to Rule 59 of the Federal Rules of Civil Procedure, and consistent with the Court's Order dated February 5, 2013, Plaintiffs file a Motion for New Trial as to the Court's Order dated January 29, 2013 granting Defendant summary judgment.

     DATED this 26th day of February, 2013.

         STEPHEN C. RYAN, P.C.


         By /s/Stephen C. Ryan
         9304 E. Raintree, #100
         Scottsdale, Arizona  85260
         Attorney for Plaintiffs Youso

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

<u>Introduction</u>.

     The Court's Order granting Defendant summary judgment was erroneous in several respects.  First, the Court relied upon a document which the Court appropriately ruled was inadmissible hearsay with that document then being the factual basis for granting summary judgment as to Count One of Plaintiffs' Complaint.

Secondly, the Court erred in determining that Plaintiffs' claim for personal property coverage under the policy (Coverage C) was appropriately decided in Defendant's favor as a matter of law.  There are numerous factual issues to be resolved by the jury as to that claim and, either through misinterpretation or misunderstanding of the facts, the Court wrongfully ruled otherwise.

Next, the Court ruled improperly as to Plaintiffs' entitlement to coverage under Coverage B, the related structure coverage.

As the Court's Order dated February 5, 2013 indicated, these issues should be brought to the Court's attention via a Motion for New Trial versus a Motion for Reconsideration.

Argument.

Turning first to the claim asserted in Count One, the negligence claim alleging that Defendant significantly underinsured Plaintiffs' home, the Court's Order resolved that issue on page 6, lines 24 through 28, finding that because "one experienced contractor agreed to repair the House for the policy limit", Defendant could not have breached its obligation to adequately insure the Yousos' home at a reasonable replacement cost.

The Court's ruling in that regard was erroneous.  The first reason is that the very evidence upon which the Court relied, specifically paragraph 44 of Defendant's Statement of Facts, was objected to by Plaintiff as being hearsay **and** the Court had properly sustained that objection in its Order (Order, page 3, lines 19 to 22).

Paragraph 44 states as follows:

> "Mr. Thomson explained to Mr. Brown what PMIC's applicable insurance limit was.  Mr. Brown then agreed to do the work for $400,339.95, which was the applicable Coverage A limit".

These facts were set forth in the declaration of Plaintiffs' claim handler, Kirk Benson.

Plaintiffs objected on the grounds that the affidavit of Mr. Benson was obviously hearsay (actually hearsay upon hearsay).  Mr. Benson was stating in his affidavit what

-2-

1    "Mr. Thompson explained to Mr. Brown", obviously outside of Mr. Benson's presence

2    which, of course, constituted inadmissible hearsay.  The Court properly agreed but

3    then used this exact "evidence" to grant summary judgment.

4            But even aside from the hearsay objection as to the purported conversation

5    between two other people, the actual estimate relied upon by the Court by Mr. Brown

6    in the amount of $400,339.95 clearly lacked foundation as well.  The "truth", i.e., the

7    merit and accuracy of the bid was obviously relied upon by the Court even though there

8    was no foundation in the record for the bid's admissibility, let alone its validity.  Even

9    aside from the fact that there was no testimony or affidavit offered by Mr. Brown, the

10   author of the bid, the bid was also inadmissible for lack of foundation because there's

11   no evidence in the record whatsoever as to how he obtained the bid, the reliability of

12   the sub-bids which comprised his bid, whether the bid was all inclusive of everything

13   that needed to be done to repair the home, etc.  The evidence was inadmissible both as

14   to hearsay, which the Court <u>agreed</u> with, and as to foundation.

15           The Court overruled Plaintiffs' objections as to lack of foundation for the facts

16   set forth in Paragraph 39, 40, and 43 of Defendant's Statement of Facts.  Foundation

17   was clearly lacking as all of the facts set forth in these paragraphs are merely Mr.

18   Benson's "understanding" of the facts set forth in those paragraphs for which he had

19   **no** personal knowledge.

20           More specifically, to summarize the facts in those paragraphs, here is what they

21   state:

22           "PMIC's independent adjuster contacted a contractor named Samons and
             those two individuals then 'worked together to determine what needed to
23           be done to restore the insured home to pre-loss condition'."  (There is no
             foundation for Mr. Benson to testify as to what these two separate
24           individuals did or did not do.)

25           Mr. Samons purportedly obtained subcontractor bids, conducted
             "independent research", supposedly "inspected the property" and
26           prepared a bid estimate.  (Again, Mr. Benson has no foundation, i.e., no
             personal knowledge of these events occurring.)

27

28                                              -3-

1

2

3

4

5

> Mr. Samons backed out and the potential "project" was turned over to yet another contractor, Bob Brown.  Mr. Brown then supposedly "inspected the loss, reviewed the blueprints and reviewed the subcontractor bids which Samons had previously obtained.  (So now we have Benson testifying to yet another contractor who was handed off the project from the original contractor so Benson's affidavit is now "testifying" to not only what the first contractor did when Benson had no personal knowledge of that fact but now a second contractor where Benson has even less knowledge of that contractor's conduct.)

6  The fact that these paragraphs lack foundation from Mr. Benson's perspective as the

7  affiant cannot even be questioned.  Mr. Benson didn't "participate" in **any** of the facts

8  set forth in Paragraphs 39, 40 and 43 – he only is reporting what he understands or

9  believes occurred.  While the Court properly determined that the factual information

10  contained in each of these three paragraphs is hearsay, the paragraphs clearly lacked

11  foundation separate and apart from the obvious hearsay issue.

12  The bottom line is that the facts contained in Paragraphs 39, 40 and 43, as well

13  as Paragraphs 44 and 45 which were also properly sustained on hearsay grounds, could

14  not even be considered by the Court but yet these are the exact paragraphs on which

15  the Court relied to grant summary judgment.

16  Even if one assumes that the evidence was not hearsay, or that a proper

17  foundation existed, the evidence before the Court still created, at best, a clear dispute

18  of fact as to the actual and reasonable cost to rebuild Plaintiffs' home.  In response to

19  Defendant's motion, Plaintiffs attached very detailed and lengthy bids from two

20  contractors in the amounts of $601,000 and $588,000, respectively (Plaintiffs'

21  Statement of Facts, paragraph 37 and 71).  So even assuming there was no hearsay or

22  foundation problem with the evidence the Court relied upon to grant summary

23  judgment, that evidence was clearly "countered" and rebutted by repair estimates

24  roughly 50% higher than what Defendant contends it would cost to repair the home.

25  So even if the "not to exceed bid" relied upon by the Court was admissible evidence,

26  there was clearly an issue of fact presented as to the actual cost to repair the Yousos'

27

28

home. [1]

Plaintiffs will next discuss the Court's ruling granting summary judgment as to Coverage C under the policy, Plaintiffs' personal property claim. In that regard, the Court granted summary judgment for the reason that "Plaintiffs have submitted no evidence that they were entitled to more than what they were paid for loss of personal property". (Order, page 7, lines 17 and 18).

The Court's ruling was erroneous for several reasons:

1) PMIC never even attempted to argue, nor did it present evidence, that its payment of approximately $132,000 to the Yousos was contended by **either** party to be a complete and final resolution of the personal property claim.

2) The evidence before the Court unquestionably showed that the payment of $132,000 was not only tremendously disputed but that the Yousos were contending much more was owed, even turning down $190,000 as being not enough.

3) The Court may have misinterpreted or misconstrued what was meant by PMIC's payment of the $132,000 as being "undisputed" when, in fact, the very use of that word means that exactly the opposite was occurring, i.e., that the parties **were** in dispute as to the amount owed under the coverage.

While it is true that Plaintiffs didn't submit any direct evidence in the form of an different dollar figure as to the amount of personal property coverage owed to them, there was no need to do that because the evidence in the record before the Court already made that very clear. First, as just stated above, PMIC didn't even argue that its payment of $132,000 was a figure that was made per an agreement between the parties or was otherwise not in dispute as to the amount owed. This dollar figure was

---

[1]And while it's certainly true that Plaintiffs didn't provide affidavits from the two contractors who provided the estimates for $601,000 and $588,000, there was no need for Plaintiffs to do that because the evidence of the moving party, who had the burden of proof, was clearly inadmissible hearsay which required Plaintiffs to actually rebut nothing even though very clear rebuttal was presented to the Court.

1    merely presented as the amount factually **paid** to date.  To illustrate, the Court is

2    referred to Exhibit 18 from the Benson affidavit where Mr. Thomson, the outside claim

3    adjuster retained by Mr. Benson, states in the very first paragraph of the letter that the

4    personal property amount of $132,000 was not deemed by PMIC itself to be an "all-

5    inclusive list" and, secondly, that the dollar figure only reflected what the independent

6    adjuster determined in his **partial** and incomplete inventory of the personal property

7    at the Yousos' residence on April 8, 2010.[2]

8         Defendant's Statement of Facts, paragraph 59 and 60, merely state that PMIC

9    "issued payment" for the $132,000 figure.  In other words, all PMIC was stating in its

10   motion was that it **paid** that sum of money, not that the parties agreed that $132,000

11   was fair or sufficient.  And as further reflected in Exhibit 19 to Mr. Benson's affidavit,

12   page 4, paragraph 10 reflects that PMIC offered $190,000 with respect to the personal

13   property claim but that this offer was "only in connection with a potential total

14   compromised resolution and settlement of all claims arising from the fire loss".  PMIC

15   itself refers to the $190,000 figure as a "compromised resolution" and that since the

16   Yousos declined to accept only $190,000 for their personal property loss, PMIC was

17   going to then issue the "undisputed value", i.e., $132,000, based upon what PMIC's

18   **own** calculation of the loss was at that point in time.  How could $132,000 be a figure

19   not factually disputed when PMIC itself had offered $190,000 and Plaintiffs said it

20   wasn't enough?

21        Dissecting all of this, the record is unquestionably clear that the Yousos believed

22   their personal property loss was substantially above $190,000 because the Yousos

23

24        [2]The dollar figure in the letter of $138,799.87 was the replacement cost figure, not
     the actual cash value figure of $132,000 which was tendered.  So not only was Defendant's
25   own evidence showing the Court that the $132,000 figure was not deemed by either party
     to be "all-inclusive" but this was the dollar figure that was derived based upon the April
26   8, 2010 inventory of the Yousos' residence which both sides agree was prematurely
     interrupted and terminated when Michelle Youso arrived at the home unaware that the
27   inventory was even being conducted.

28                                              -6-

1   turned down PMIC's offer of $190,000, roughly 50% more than the $132,000 which

2   PMIC had paid at that point as the "undisputed amount".  While the Yousos turned

3   down the $190,000 in part because PMIC's offer amounted to bad faith per se by

4   requiring the Yousos to release any claim for bad faith in exchange for payment of the

5   $190,000, these facts unquestionably alerted the Court to the fact that the amount of

6   loss under Coverage C was significantly in dispute in an amount far greater than the

7   $132,000 paid by PMIC, and clearly not subject to summary judgment.

8        As alluded to earlier, perhaps the Court misinterpreted or misunderstood what

9   was meant by PMIC's payment of the "undisputed amount" of $132,000 and treated

10  the payment as if there was no dispute between the parties.  In insurance claim

11  handling jargon, payment by an insurance company of an "undisputed amount" does

12  not mean that the parties do not have a dispute as to the amount paid and, in fact,

13  exactly the opposite is true.  When there is a dispute between the parties as to the

14  amount of a loss, the policyholder's insurance company has a legal obligation to

15  promptly tender what is referred to as the "undisputed amount" of the loss.  That

16  requirement has been the law in Arizona since the decision in *Borland v. Safeco,* 147

17  Ariz. 195, 709 P.2d 552 (1985).   Indeed, when an insurance company pays an

18  "undisputed amount" on a claim, there exists, **by definition**, a factual dispute

19  between the parties.

20       As an example, suppose the insured believed its bedroom furniture was worth

21  $1,500 and the insurance company believed it was worth $1,000.   Once the parties fail

22  to agree, the insurance company has a legal duty, as a matter of law, to promptly

23  tender the $1,000 which the insurance company admits and acknowledges is the **least**

24  that is owed and then the parties continue to deal with their differences as to value on

25  down the road.  The legal requirement of paying an "undisputed amount" of a first

26  party claim is premised upon the clear assumption that if the insurance company,

27  using the above example, could simply say, "Well then, we're not paying you anything

28

1   until we agree on a figure" as opposed to tendering the $1000 where the insurance

2   company knows it owes at least that much, it gives the insurance company tremendous

3   leverage and unfair advantage trying to resolve the remaining dispute as to value.

4         At various times throughout the evidence presented to the Court, there was

5   reference made to PMIC's payment of the $132,000 as an "undisputed amount". Any

6   such reference was never intended by PMIC to suggest that the parties had agreed on

7   that amount or that there was no dispute that only $132,000 was owed. As pointed

8   out, the evidence overwhelmingly supports a very vigorous dispute as to the amount

9   owed (plus, as well, PMIC's bad faith per se conduct in an attempt to resolve that

10  dispute).

11        The Court is again referred to Exhibit 19 where, on page 2, PMIC's own attorney

12  states that the payment of the $132,000 was determined from "information **currently**

13  **available** to Pharmacists Mutual" (emphasis added) and that PMIC was only making

14  an "undisputed" payment which the law **compelled** PMIC to tender to the Yousos

15  once **at least** that amount of money was determined by PMIC to be owed.

16        In actual fact, Plaintiffs' personal property claim is in the amount of $336,000

17  for actual cash value, $354,000 in replacement cost value. This documentation was

18  disclosed in Plaintiffs' Disclosure Statement to Defendant dated April 6, 2012, nearly

19  one year ago. (See attached Exhibit 1, Plaintiffs' Eighth Disclosure Statement

20  Supplementation and attachment of face sheet Bates stamp Youso 455 scr.) [3] This

21  information was not provided to the Court because, as noted above, PMIC wasn't even

22  attempting to assert or argue that its payment of $132,000 "resolved" the personal

23  property claim or that the amount owed was not factually disputed. All PMIC was

24  doing was telling the Court that it had "paid" that sum of money, not that it was

25

26  ───────────────

27      [3]The actual 78-page itemization of personal property items is not attached as only the "dollar figure" of the inventory total is relevant.

28

1   acknowledged to be a full and complete payment.  In fact, the payment was over
2   $200,000 short.

3       To conclude as to the personal property issue:

4   •       PMIC never even argued that its payment was acknowledged to be
5           acceptable to the Plaintiffs.  For that reason, Plaintiffs didn't need to
6           rebut that figure.

7   •       There was significant evidence in the record before the Court showing
8           that the payment of $132,000 was not only being fought and disputed
9           but that the Yousos had turned down $190,000 on their personal
10          property claim.

11  •       The reference in the record to paying the "undisputed amount" is,
12          perhaps ironically, a reference to exactly the opposite factual scenario
13          actually existing, namely, that the amount paid **is** in dispute because
14          more is deemed owed.

15  •       The evidence presented by PMIC itself reflects that the $132,000 was not
16          an "all-inclusive" figure and that it only reflected the "total" dollar figure
17          arising from the April 8, 2010 personal property inventory and
18          inspection which was acknowledged by both parties to have been
19          terminated before it was even close to completion.

20  Finally, while the attached Exhibit 1 is clearly not essential for the Court to reverse its
21  summary judgment ruling, Plaintiffs have, out of an abundance of caution, submitted
22  that additional evidence for the Court's consideration.

23      Turning now to the coverage afforded under the policy for "related structures",
24  Coverage B, the Court erred in its interpretation of the meaning and intent behind this
25  policy provision.  Coverage B, which adds 10% to the Coverage A structural limit,
26  applies when the replacement cost of any damaged related private structures is less
27  than $1,000.  The "rationale" or intent behind this policy provision is that the

28                                          -9-

insurance company knows that the policyholder may have "related private structures", i.e., structures that are separate and distinct from the home itself.  For those "related structures" the policy provides coverage in an amount equal to 10% of the Coverage A structure limits.  However, if it should turn out that there are no related private structures which are damaged or, if damaged, have a "replacement cost" of less than $1,000, then the Coverage A structural limits are automatically increased by 10%.

In essence, Coverage B is additional coverage available to the policyholder for "related structures" but, if not needed or used to the extent of $1,000 or more, the Coverage A limits are increased 10%.  Under these circumstances, it's obvious that the insurance company is anticipating having to potentially pay for some "related structures" damaged in a fire but, if that loss is non-existent or less than $1,000, then the Coverage A limits go up.  If the loss to these "related structures" is over $1,000, the policyholder has the Coverage B limits for these related structures equal to 10% of the coverage A limits but the Coverage A limits don't increase.  The policy states, "You may add an amount equal to the limit" for Coverage B "to the limit shown on the declarations for Coverage A".  But the ability to do so applies only when damage to related structures is "less than $1,000".

In this particular case, PMIC based its decision to deny the additional 10% for Coverage A based on a retaining wall in front of the Youso home.  According to Mr. Benson's affidavit, this retaining wall "qualified as a related structure with a value exceeding $1,000.  That property was not damaged by the fire." A more clear misapplication of the intent and verbiage of the policy by PMIC could not be imagined. Coverage B requires a determination as to whether the "replacement cost" of a related structure exceeds, or does not exceed, $1,000.  In this particular case, PMIC **admits**

1    that the retaining wall wasn't damaged at all. [4]

2        Since Mr. Benson determined that the retaining wall was a "related structure"
3    that didn't sustain any damage, then there was no "related structure" damage to the
4    Youso residence in any amount, let alone in excess of $1,000 which, in turn, means
5    that the Yousos "may add" an amount equal to the Coverage B structure limit to the
6    Coverage A structure limit, i.e., 10% of the structure A coverage.

7        To conclude as to Coverage B, PMIC admitted that there was no related
8    structure with damage in excess of $1,000 and, therefore, the Coverage A structure
9    limit automatically goes up 10%.   The Court erred in interpreting the intent, meaning
10   and purpose of Coverage B as it pertains to related structures and the resulting effect
11   on Coverage A. If there are no related structures damaged greater than $1,000,
12   Coverage A goes up as the clear language of the policy indicates.  The Court's ruling to
13   the contrary was in error.

14       Because the Court granted summary judgment as to the negligence and breach
15   of contract claims, the Court obviously found that the claim for bad faith and punitive
16   damages went away as well.  For that reason, it would not be appropriate for counsel
17   undersigned to discuss or argue the facts in support of Plaintiffs' claims in that regard
18   other than to state that once the claims for breach of contract and negligence are
19   revived, the remaining claims sought by Plaintiffs related to the many and very
20   significant factual disputes are clearly not subject to summary judgment either.

21       As Local Rule 7.1 (b) (2) appears to require an Order to be lodged with the filing
22   of this Motion, a proposed Order is attached to this Motion.

23   . . . .

24   . . . .

25

26   ───────────────

27   [4]Whether or not the retaining wall is a "related structure", or whether its value is $2,650, are both immaterial facts since PMIC admits the wall wasn't damaged.

28                                    -11-

1       DATED this 26th day of February, 2013.

2                      STEPHEN C. RYAN, P.C.

3

4                      By /s/Stephen C. Ryan
                      9304 E. Raintree, #100

5                      Scottsdale, Arizona  85260
                      Attorney for Plaintiffs Youso

6

                 **CERTIFICATE OF SERVICE**

7

8       I hereby certify that on February 26th, 2013, I electronically submitted the attached document to the Clerk's office using the CM/ECF System for filing and transmittal of  a Notice of Electronic Filing to the following CM/ECF registrants:

9

10  Clerk, U.S. District Court (Prescott Division)
     101 W. Goodwin Street
     Prescott, Arziona 86303

11

     Neil V. Wake
12  United States District Court
     401 W. Washington Street, SPC 524
13  Phoenix, Arizona 85003

14  John C. Hendricks - jhendricks@meagher.com
     Thomas H. Crouch - tcrouch@meagher.com
15  MEAGHER & GEER, PLLP
     8800 N. Gainey Center Drive, Suite 261
16  Scottsdale, Arizona 85258
     Attorneys for Defendant

17

18       I hereby certify that on February 21, 2013, I served the attached document by e-mail on the following, who are not registered participants of the CM/ECF System:

19  None.

20  By /s/ Cindy Rock

21

22

23

24

25

26

27

28                            -12-